# 2:05-CV-1157-WKW

# DEFENDANTS' SPECIAL REPORT & ANSWER
# PAGES 1 - 13

# BALCH & BINGHAM

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HERMAN PAUL JOHNSON, #242189, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | CIVIL ACTION NO. |
| DONAL CAMPBELL, COMMISSIONER ) | 2:05-CV-1157-WKW |
| OF THE ALABAMA DEPARTMENT OF ) | |
| CORRECTIONS, WARDEN MOSELY, ) | |
| DR. DARBOUZE, et al., ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT'S SPECIAL REPORT AND ANSWER**

COME NOW, Defendant Dr. Jean Darbouze ("Dr. Darbouze"), pursuant to this Court's Orders dated January 23, 2006, and February 13, 2006, requiring him to provide a Special Report and Answer, and submits the following Special Report and Answer addressing the allegations asserted by Plaintiff Herman Paul Johnson ("Plaintiff"):

**I.   INITIAL DISCLOSURES**

Dr. Darbouze makes the following initial disclosures as required by this Court's January 23, 2006, Order for Special Report and this Court's February 13, 2006, Order on Plaintiff's Second Amended Complaint (the "Complaint"):

   A.   The sworn statement of Dr. Jean Darbouze;[1]

   B.   The sworn statement of Kay Wilson;[2] and

---

[1] A true and correct copy of Dr. Jean Darbouze's affidavit ("Darbouze Affidavit") is attached hereto as Exhibit B and incorporated herein by reference.

89496.1

    C.    The sworn statement of Dr. John G. Fortin.[3]

    D.    The sworn statement of Beth Long with medical records attached thereto;[4]

## II.  NARRATIVE STATEMENT OF UNDISPUTED FACTS

### A.  SUMMARY OF AMENDED COMPLAINT

Plaintiff's Complaint essentially alleges that Dr. Darbouze provided him inadequate medical treatment during his incarceration at Easterling Correctional Facility ("Easterling"). Most of his complaints are conclusory, not to mention incoherent and difficult to discern and are, therefore, insufficient to state a constitutional violation. See Fullman v. Graddick, 739 F.3d 553, 556-57 (11th Cir. 1984) (stating that conclusory allegations are insufficient to state a § 1983 claim for relief). Although, Plaintiff includes a laundry list of allegations complaining that Dr. Darbouze failed to provide him adequate health care, a review of the underlying facts of this case, the supporting affidavits and Plaintiff's medical records demonstrates that Plaintiff has been in overall poor health ever since he arrived at Easterling and that he suffers from multiple illnesses and diseases that cause him discomfort on a regular basis. (Darbouze Affidavit at ¶ 3). The evidence also demonstrates that Dr. Darbouze has at all times provided Plaintiff appropriate and timely medical treatment and has never refused to provide Plaintiff medical treatment when needed. (Darbouze Affidavit at ¶ 21; Medical Records attached to Long Affidavit as Exhibit 1-20).

---

[2] A true and correct copy of Kay Wilson's affidavit ("Wilson Affidavit") is attached hereto as Exhibit C and incorporated herein by reference.

[3] A true and correct copy of Dr. John G. Fortin's affidavit ("Fortin Affidavit") is attached hereto as Exhibit D and incorporated herein by reference.

[4] A true and correct copy of Beth Long's affidavit ("Long Affidavit") is attached hereto as Exhibit A and incorporated herein by reference.

The allegations in Plaintiff's Complaint can be summarized as follows: (1) Dr. Darbouze has provided him inadequate treatment for his diabetes. (Complaint at ¶¶ 13, 15, 28-29, 33-34); (2) Dr. Darbouze has failed to provide him glasses and otherwise treat his "blindness". (Complaint at ¶¶ 14, 24, 34); (3) Dr. Darbouze has failed to properly treat his arthritic knee. (Complaint at ¶¶ 16, 19, 27, 32); and (4) Dr. Darbouze has failed to otherwise provide Plaintiff adequate medical treatment for his migraines, kidney function failure, and central nervous system damage. (Complaint at ¶¶ 25, 27, 28, 32, 34). Each of these complaints and the prescribed treatment is discussed in more detail below.

**B. PLAINTIFF'S HISTORY OF MEDICAL TREATMENT DURING INCARCERATION**

**1. TRANSFER TO EASTERLING**

On September 29, 2005, Plaintiff was transferred from Kilby Correctional Facility to Easterling. (Wilson Affidavit at ¶ 3 and Transfer and Receiving Form attached to Long Affidavit as Exhibit 1). Upon being admitted to Easterling, the Department of Corrections provided Plaintiff an access to Health Care form explaining the sick call procedure. (Wilson Affidavit at ¶ 8 and Access to Health Care Form attached to Long Affidavit as Exhibit 2). The document provides, among other things, that: inmates shall have access to health care twenty-four (24) hours a day, seven (7) days a week; sick call request forms will be processed seven (7) days a week and are available in the dorm cube or any shift commander's office; sick-call forms should be submitted in the locked box outside the dining "chow" hall; inmates are to advise the nearest Correctional Officer in the event of an emergency, and in the event of a medical emergency, prompt access to health care will be provided. (See id.). At the time Plaintiff was admitted, the medical staff at Easterling completed a "Transfer & Receiving Screening Form" and identified

Plaintiff's current and chronic medical problems and complaints. (Transfer and Receiving Screening Form attached to Long Affidavit as Exhibit 1).

### 2. GRIEVANCE PROCEDURES AND SICK CALL REQUEST PROCESS AT EASTERLING

Plaintiff has at no time filed a grievance of any kind through the grievance procedure at Easterling. (Wilson Affidavit at ¶ 7). Easterling has a well-established grievance procedure for any inmate who wishes to voice a complaint regarding any medical treatment he has sought or received during his incarceration at Easterling. (Wilson Affidavit at ¶¶ 5-7). Upon his arrival at Easterling, the Department of Corrections notified Plaintiff of the existence of the grievance process, the location of grievance forms as well as the details of the grievance process itself. (Wilson Affidavit at ¶ 5). The existence of the grievance procedure is well known among the prison population at Easterling. (See id.).

The grievance process consists of two steps. (Wilson Affidavit at ¶ 6). In order to initiate the grievance process, an inmate must submit an "informal" grievance, describing his complaint or complaints about medical treatment he has sought or received at Easterling. (Id.). Within five to seven days of submission of an informal grievance, the medical staff will provide a response to the grievance. (Id.). If an inmate is displeased or not satisfied with the response to his informal grievance, he may submit a "formal" grievance, which is also known as a "grievance appeal," explaining why the inmate is displeased or not satisfied with the response provided by the medical staff. (Id.). The medical staff will provide a response to any grievance appeal within five to seven days of submission of such an appeal. (Id.). Kay Wilson, the HSA at Easterling, reviews and responds to all informal and formal grievances on a daily basis. (Id.).

Informal grievance forms are available to all inmates and are located in the Shift Commander's Office in the inmates' dorms. (Wilson Affidavit at ¶ 7). Inmates may obtain an

informal grievance form at any time of the day. (Id.). Formal grievance or "grievance appeal" forms are located in the Health Care Unit and are available to inmates at all times upon the inmate's request. (Id.). Inmates are instructed to place informal grievance forms in the locked box located outside the dining or "chow" hall. (Id.). Wilson retrieves the grievance forms from the mailbox on a daily basis, reviews them and either respond in writing or sends for the inmate immediately depending on the severity of the medical complaint. (Id.). Wilson provides a written response at the bottom of the form and returns a completed copy of the grievance to the inmate. (Id.). She provides an additional copy of the completed grievance to her administrative assistant who in turn places a copy of the completed grievance in the inmate's medical records file. (Id.). This grievance process has been in place and available the entire time Plaintiff has been incarcerated at Easterling. (Id.). **Plaintiff never filed any informal or formal grievance regarding any aspect of the medical care received by Plaintiff by PHS during his incarceration at Easterling.** (Id.).

Easterling also has a well-established sick-call procedure for inmates to follow in order to receive access for routine medical treatment. (Wilson Affidavit at ¶ 8). Upon being admitted to Easterling, inmates are shown a video explaining the sick call procedure. (Id.). Upon his most recent incarceration, Plaintiff was provided and signed a Department of Corrections' Form entitled Kilby Correctional Facility Access to Health Care. (Wilson Affidavit at ¶ 8; Access to Health Care Form attached to Long Affidavit as Exhibit 2). At that time, Plaintiff also received a Department of Corrections' Form entitled Easterling Correctional Facility Access to Health Care. (Wilson Affidavit at ¶ 8). Sick call request forms are available to all inmates and are located in the Shift Commander's Office in the inmates' dorms. (Id. at ¶ 9). Inmates may obtain these forms at any time of the day. (Id.). Before reporting to sick call, inmates must complete a sick

call request screening form and turn it into the Easterling medical staff for processing. (Id.). Inmates are instructed to complete the sick call request form and place it in the designated locked box located outside the front entrance to the dining "chow" hall. (Id.). Inmates who wish to be seen by a doctor must report for sick call or sign a refusal of treatment if declining care at that time. (Id.). Easterling conducts sick call five (5) times per week, Sunday through Thursday excluding holidays or unexpected emergencies. (Id.). Sick call begins at 12:30 p.m. and lasts as long as necessary to examine all of the inmates who report to sick call. (Id.).

The medical staff at Easterling conducts sick call in the following manner. (Wilson Affidavit at ¶ 10). First, the HSA confirms upon receipt of the sick call request forms that no inmate requires emergency treatment or attention of any kind. (Id.). Thereafter, the medical staff at Easterling prepares a list of inmates to be seen in sick call that day and provides it to the shift command officer in the dorm so that he will know what inmates to send to the Health Care Unit for sick call on that day. (Id.). Once the inmates arrive in the Health Care Unit, a registered nurse and/or nursing staff examine each of the inmates. (Id.). If the inmate's complaint is minor, the registered nurse and nursing staff treat the inmate; if the inmate's complaint is considered moderate, the complaint is referred to the treating physician to provide verbal orders regarding treatment, and if the complaint is severe, the inmate is held at the Health Care Unit for the treating physician to examine. (Id.).

It is not uncommon for an inmate who has filled out a sick call request form to refuse to report to sick call. (Wilson Affidavit at ¶ 11). If an inmate fails to report to sick call after completing a sick call request or otherwise refuses medical treatment, the medical staff at Easterling provides the inmate a waiver or "Release of Responsibility" form to sign. (Id.). Often, inmates such as Plaintiff, who have filled out a sick-call request form and who fail to

show up for sick call upon being sent for, refuse to sign the waiver form. (Id.). It is standard procedure for inmates who refuse to report to sick call to sign these waiver forms. (Id.).

Since his incarceration at Easterling, Plaintiff has submitted a total of eight (8) sick call request forms, requesting treatment for scabies, dentures, high blood sugar, dizziness, weakness, loss of consciousness, seizures, kidney failure, nerve damage, pain and blindness. (Wilson Affidavit at ¶ 12; Sick Call Request Forms attached to Long Affidavit as Exhibit 3). For each sick call request form submitted by Plaintiff, Dr. Darbouze or the medical staff at Easterling promptly responded to his request for treatment. (Darbouze Affidavit at ¶ 21). However, Plaintiff refused to report to sick call or refused to accept medical treatment after submitting at least four (4) of these sick call request forms. (Wilson Affidavit at ¶ 12; Waiver Forms attached to Long Affidavit as Exhibit 4). On at least five (5) other occasions, Plaintiff signed or was provided and refused to sign a waiver form indicating that he refused to accept medical treatment. (Id.). Plaintiff was never coerced into signing a waiver form. (Id.).

### 3. SICK CALL REQUESTS SUBMITTED BY PLAINTIFF

Plaintiff submitted his first sick call request form at Easterling in early October 2005. (Darbouze Affidavit at ¶ 6; Sick Call Request Forms attached to Long Affidavit as Exhibit 3). He submitted additional sick call request forms on the following dates: October 10 and 27, 2005, November 7 and 11, 2005, December 5 and 9, 2005, and January 17, 2005. (Id.). Plaintiff either refused to show up for sick call or otherwise refused medical treatment after submitting the sick call request forms dated October 27, November 7, December 5 and 9, 2005, as he signed waivers on the same date as the sick call request or within a couple days thereafter. (Id.). Plaintiff has signed additional waivers indicating his refusal to accept the following medical treatments: a blood sugar check, insulin injection, blood pressure medication and a hepatitis B vaccine. (Id.).

In early October 2005, Plaintiff submitted a sick call request form stating that Dr. Darbouze had ordered Plaintiff the following profiles: no standing for long periods of time, no work duty, and a bottom bunk assignment. (Darbouze Affidavit at ¶ 7; Sick Call Request Form attached to Long Affidavit as Exhibit 3; Special Needs Communications Forms at Exhibit 5). A profile permits an inmate to deviate from the standard practices and procedures at Easterling. (Darbouze Affidavit at ¶ 7). Plaintiff apparently had received only his bottom bunk profile. (Darbouze Affidavit at ¶ 7; Sick Call Request Form attached to Long Affidavit as Exhibit 3). Therefore Dr. Darbouze reordered the profiles on October 14, 2005. (Darbouze Affidavit at ¶ 7; Special Needs Communication Forms at Exhibit 5). He renewed the profiles on December 29, 2005. (Id.). The Department of Corrections and the medical staff at Easterling have adhered to his orders. (Darbouze Affidavit at ¶ 7). Plaintiff does not complain that Dr. Darbouze failed to order Plaintiff these profiles in his Complaint.

On October 10, 2005, Plaintiff submitted a sick call request form, stating that he had scabies and that he needed glasses. (Darbouze Affidavit at ¶ 8). Plaintiff had been treated for scabies shortly before being transferred to Easterling from Kilby on September 19, 2005. (Id.). On October 12, 2005, Dr. Darbouze examined Plaintiff and determined that he needed corrective glasses. (Id.). The next day, Dr. Darbouze referred Plaintiff for an appointment with an outside ophthalmologist, Dr. John G. Fortin. (Darbouze Affidavit at ¶ 8; Referral Form attached to Long Affidavit as Exhibit 6). Plaintiff makes a general allegation in his Complaint that he suffers from "blindness." (Complaint at ¶ 34). Dr. Fortin's findings and diagnosis, which are discussed in more detail below, indicate that Dr. Darbouze and the Easterling medical staff have provided Plaintiff with appropriate medical treatment for the problems related to his vision and that there is no additional treatment available to Plaintiff at this time. (Fortin Affidavit at ¶¶ 5, 8-9).

On October 27, 2005, Plaintiff submitted another sick call request form complaining of pain in his right leg as well as weakness in his right side, worsening vision and scabies. (Darbouze Affidavit at ¶ 9; Sick Call Request Form attached to Long Affidavit as Exhibit 3). That same day, PHS medical staff attempted to check Plaintiff's blood sugar and administer him his insulin injection. (Darbouze Affidavit at ¶ 9; Waiver Forms attached to Long Affidavit as Exhibit 4). Plaintiff, however, refused to allow the medical staff at Easterling to provide him medical treatment and refused to sign the waiver. (Id.). On October 30, 2005, Plaintiff signed another waiver acknowledging that he had refused to report to sick call. (Id.). That same evening at approximately 10:45 p.m., Plaintiff signed another waiver acknowledging that he had refused to report to sick call. (Id.). As mentioned above, Dr. Darbouze had already referred Plaintiff to an ophthalmologist on October 13, 2005. (Darbouze Affidavit at ¶ 9). Plaintiff complains of weakness in his Complaint to this Court; however, as evidenced above, Plaintiff refused treatment for his complaint of weakness when Dr. Darbouze and the medical staff at Easterling attempted to provide it to him. (See Waiver Forms attached to Long Affidavit as Exhibit 4).

On November 7, 2005, Plaintiff submitted another sick call request form complaining of dizziness, weakness, loss of consciousness, seizures, kidney failure, nerve damage and blindness. (Darbouze Affidavit at ¶ 11; Sick Call Request Form attached to Long Affidavit as Exhibit 3). There is nothing in Plaintiff's medical records to suggest Plaintiff has ever experienced a seizure. (Id.). Plaintiff submitted another sick call request on November 7, 2005, stating that he refused to take his blood pressure medication until he saw a doctor. (Id.). On November 10, 2005, Dr. Darbouze examined Plaintiff and prescribed him Colace and Ducolox, medications to reduce

fluid retention and relieve constipation. (Physician's Orders attached to Long Affidavit as Exhibit 11).

On November 11, 2005, Plaintiff submitted a sick call request form requesting dentures. (Darbouze Affidavit at ¶ 12; Sick Call Request Form attached to Long Affidavit as Exhibit 3). On December 5, 2005, Plaintiff submitted another sick call request form requesting dentures. (Id.). On December 6, 2005, the medical staff at Easterling examined Plaintiff's teeth and determined that he needed upper dentures, partial lower dentures and fillings. (Darbouze Affidavit at ¶ 12; Dental Record attached to Long Affidavit as Exhibit 7). On January 17, 2006, Plaintiff submitted an additional sick call request form requesting dentures. (Darbouze Affidavit at ¶ 12; Sick Call Request Form attached to Long Affidavit as Exhibit 3). Plaintiff is currently on the waiting list to receive dentures. (Darbouze Affidavit at ¶ 12). Plaintiff does not make any allegations in his Complaint regarding the dental treatment he has received while incarcerated at Easterling.

On December 9, 2005, Plaintiff submitted a sick call request form, requesting "additional chronic care evaluations and prescribed medication that does not leave him in continuous pain." (Darbouze Affidavit at ¶ 13; Sick Call Request Form attached to Long Affidavit as Exhibit 3). He further stated that "his sugar count was 439 and at a dangerous level and that he needs more extensive testing to determine eligibility for treatment. (Id.). As thoroughly discussed below, Plaintiff reports to the Chronic Care Clinic at Easterling twice a day every day and Dr. Darbouze regularly checks Plaintiff's blood sugar and adjusts his medication and insulin accordingly. (Darbouze Affidavit at ¶¶ 4, 14).

### 4. TREATMENT RECEIVED BY PLAINTIFF FOR HIS DIABETES.

Because Plaintiff suffers from diabetes, he reports to the Chronic Care Clinic at Easterling twice a day to have his blood sugar checked and to receive insulin. (Darbouze Affidavit at ¶ 4; Chronic Care Clinic Records attached to Long Affidavit as Exhibit 8). As evidenced by the attached Nurses' Progress Notes and Physician's Progress Notes, the medical staff monitors Plaintiff on a regular basis to check to see how he is feeling. (Nurses' Progress Notes and Physician Progress Notes attached to Long Affidavit as Exhibits 9 and 10). Plaintiff's medical records indicate the degree and scope of medical treatment provided to him during his incarceration at Easterling. (See All Medical Records attached to Long Affidavit as Exhibits 1-20).

Other than reporting to the Chronic Care Clinic twice a day to have his blood sugar monitored, Dr. Darbouze monitors Plaintiff's diabetic condition on a regular basis. (Darbouze Affidavit at ¶ 14; Physician Progress Notes and Physician Orders attached to Long Affidavit as Exhibits 10 and 11). Plaintiff complains that the medication Dr. Darbouze has prescribed to him to regulate his blood sugar has made him feel nauseous and dizzy. (Darbouze Affidavit at ¶ 14). According to Dr. Darbouze, nausea, dizziness and weakness are all symptoms of Plaintiff's medical conditions, including cirrhosis, diabetes and anemia and the side effects of the drugs prescribed to treat those conditions. (Id.). It is not uncommon for patients diagnosed with cirrhosis to suffer these symptoms, because cirrhosis causes sluggishness, confusion and mental wandering. (Id.). Glucophage and Glucotral, medications prescribed to Plaintiff to regulate his blood sugar, have side effects which include dizziness and nausea. (Id.). Another cause of Plaintiff's dizziness is his anemia. (Id.). Dr. Darbouze has also prescribed Plaintiff iron pills to take daily, but Plaintiff refuses to take his iron pills as directed. (Id.).

Regulating Plaintiff's blood sugar and insulin level is an on-going process. (Darbouze Affidavit at ¶ 15). Dr. Darbouze has adjusted Plaintiff's insulin multiple occasions since his incarceration at Easterling. (Id.). When Plaintiff's blood sugar level was elevated, Dr. Darbouze ordered additional measures to monitor Plaintiff until his blood sugar was again under control. (Id.). For example, Dr. Darbouze ordered that Plaintiff stay in the infirmary from November 15, 2005 to November 23, 2005, due to an exceptionally dangerous increase in his blood sugar. (Id.). On November 17, 2005, Plaintiff fell on his left knee while staying in the infirmary under the Easterling medical staff's supervision. (Id.). For the remainder of Plaintiff's stay in the infirmary, Dr. Darbouze restricted Plaintiff to a wheelchair because he was concerned that he might fall again as a result of his extremely elevated blood sugar and the dizziness and weakness associated therewith. (Id.). Plaintiff requested to take a walk outside, but Dr. Darbouze advised him that he needed to forego walking outside until his blood sugar was under control. (Id.). Dr. Darbouze ordered x-rays of Plaintiff's knee and prescribed Plaintiff Bengay for joint pain associated with his arthritis. (Id.).

Plaintiff alleges in his Complaint that Dr. Darbouze has restricted his exercise and has failed to provide him a wheelchair. (Complaint at ¶¶ 17 and 18). The only time that Dr. Darbouze has considered it appropriate to restrict Plaintiff's exercise and to further restrict him to a wheelchair was when his blood sugar was not controlled. (Id.). Dr. Darbouze has not ordered a wheelchair for Plaintiff to use at all times, because it is appropriate for Plaintiff to exercise and he does not need a wheelchair for full-time use at this time. (Id.).

On December 7, 2005, Dr. Darbouze examined Plaintiff who complained of nausea. (Darbouze Affidavit at ¶ 16). Dr. Darbouze adjusted Plaintiff's Glucotral and Glucophage and prescribed him Aldactone and Lasix, which are both drugs prescribed to persons diagnosed with

cirrhosis to reduce the amount of fluid in the body and to therefore eliminate nausea. (Id.). Dr. Darbouze also ordered a blood sugar check and a follow-up appointment in one week. (Id.). He also ordered a monofilament test on Plaintiff's feet to determine the degree of peripheral nerve loss as a result of his diabetes. (Id.). The test results indicated no loss of protective sensation. (See Monafilament Testing Results attached to Long Affidavit as Exhibit 12). Dr. Darbouze also prescribed Plaintiff insoles and diabetic hose to reduce some of the swelling and pain he had been experiencing in his feet and ankles as a result of his diabetes. (Darbouze Affidavit at ¶ 16). Plaintiff signed a form acknowledging his receipt of insoles and hose on December 7, 2005. (Receipt of Medical Equipment Form attached to Long Affidavit as Exhibit 13).

> 5. **TREATMENT FOR MACULAR DEGENERATION AND OTHER MEDICAL CONDITIONS AFFECTING THE EYES.**

Plaintiff has repeatedly told Dr. Darbouze that he believes he needs laser surgery. (Darbouze Affidavit at ¶ 9). However, Dr. Darbouze concluded laser surgery is not appropriate in Plaintiff's case because he suffers from macular degeneration. (Id.). Dr. Darbouze referred Plaintiff to Dr. Fortin, a board certified ophthalmologist, who also concluded laser surgery is not appropriate. (Fortin Affidavit at ¶ 8).

On November 9, 2005, Dr. Fortin examined Plaintiff and diagnosed him with macular degeneration in both eyes. (Fortin Affidavit at ¶ 3; Consulting Physician Report attached to Long Affidavit as Exhibit 14). Macular degeneration is an incurable eye disease which typically affects persons over the age of 55. (Fortin Affidavit at ¶ 4). The exact cause of macular degeneration is unknown and it is typically thought to be a hereditary condition. (Id.). Macular degeneration results from the deterioration of the central portion of the retina. (Id.). Vitamins are often prescribed to prevent the worsening of macular degeneration. (Id. at ¶ 5). Plaintiff receives a multivitamin daily. (Darbouze Affidavit at ¶ 9). Dr. Fortin also noted cataracts in