# 2:05-CV-1157-WKW

# EXHIBIT A
# AFFIDAVIT OF DR. JEAN DARBOUZE

# BALCH & BINGHAM

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HERMAN PAUL JOHNSON #242189, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO. |
| DONAL CAMPBELL, COMMISSIONER | ) 2:05-CV-1157-WKW |
| OF THE ALABAMA DEPARTMENT OF | ) |
| CORRECTIONS, WARDEN MOSELY, | ) |
| DR. DARBOUZE, et al., | ) |
| | ) |
| Defendants. | ) |

### AFFIDAVIT OF DR. JEAN DARBOUZE

STATE OF ALABAMA   )
                   )
COUNTY OF BARBOUR  )

Before me, the undersigned Notary Public, personally appeared DR. JEAN DARBOUZE who, after being duly sworn, states as follows:

1. My name is Dr. Jean Darbouze. I am over the age of nineteen (19) years and have personal knowledge of the information contained in this affidavit.

2. I have been a licensed physician in Alabama since 1996 and have been board certified in internal medicine since 1997. From February of 2000 through February of 2004, and again from April 16, 2004 through the present, I have been employed as the Medical Director for Easterling Correctional Facility ("Easterling") in Clio, Alabama.

3. On or about September 29, 2005, Herman Johnson ("Johnson") was transferred to Easterling and he presently remains incarcerated at Easterling as of the date of this affidavit. Johnson is sixty (60) years old and has been in overall poor health since he first arrived at

91263.1

Easterling. Since Johnson's incarceration at Easterling, I have provided him medical treatment for various medical conditions including, but not limited to, the following: diabetes, cirrhosis, hepatitis C, anemia, arthritis and gastro-intestinal illness. I have provided and continue to provide Johnson with medical treatment on a regular and frequent basis. Such treatment includes, but is not limited to: (1) prescribing Johnson medication; (2) ordering that he receive certain medical equipment as needed such as glasses, diabetic insoles, diabetic support hose and a cane; (3) ordering that he receive certain "profiles"; (4) ordering appropriate testing and lab work; and (5) referring him to outside medical care providers when appropriate. Due to Johnson's overall poor health, the severity of his medical conditions and the symptoms associated with those conditions, it is not possible to alleviate all of Johnson's symptoms and insure that he feels good all of the time.

4. Because Johnson suffers from diabetes, he reports to our Chronic Care Clinic twice a day to have his blood sugar checked and to receive insulin. The Chronic Care Clinic is held on a regular basis at Easterling in order to provide regular medical attention and oversight of those inmates with chronic medical conditions. The Chronic Care Clinic generally treats inmates with diabetes, hypertension, seizures, asthma or other pulmonary disorders and tuberculosis. I do not examine Johnson on every occasion he reports to the Chronic Care Clinic. However, the medical staff monitors Johnson on a daily basis. Johnson's medical records generally indicate the degree and scope of medical treatment provided to him during his incarceration at Easterling.

5. As of January 31, 2006, I had examined Johnson at least twenty-two (22) times during the four (4) months he has been incarcerated at Easterling. Since his incarceration at Easterling, Johnson has submitted a total of eight (8) sick call request forms, requesting treatment for scabies, dentures, high blood sugar, dizziness and weakness, loss of consciousness,

treatment for scabies, dentures, high blood sugar, dizziness and weakness, loss of consciousness, seizures, kidney failure, nerve damage, pain, and blindness. Johnson has verbally complained to me about the medical treatment he has received while incarcerated at Easterling. The complaints made by Johnson have been related to his desire to have laser surgery on his eyes and feelings of nausea and dizziness related to the medications I have prescribed to him to control his diabetes and cirrhosis. Johnson has not filed a grievance of any kind through the established grievance procedure at Easterling.

6. Upon his incarceration at Easterling, Johnson submitted a sick call request form in early October 2005. He submitted additional sick call request forms on the following dates: October 10 and 27, 2005, November 7 and 11, 2005, December 5 and 9, 2005 and January 17, 2005. Johnson either refused to show up for sick call or otherwise refused medical treatment after submitting the sick call request forms dated October 27, November 7, December 5 and 9 as he signed waivers on the date of the sick call request or within a couple days thereafter. Johnson has signed additional waivers indicating his refusal to accept the following medical treatments: blood sugar check, insulin injection, blood pressure medication and a hepatitis B vaccine.

7. In early October 2005, Johnson submitted a sick call request form stating that I had ordered the following profiles: no standing for long periods of time, no work duty, and a bottom bunk assignment. A "profile" permits an inmate to deviate from the standard practices and procedures at Easterling. Johnson apparently had received only his bottom bunk profile. On October 14, 2005, I reordered the same profiles. I again reissued these same orders on December 29, 2005. It is my understanding, these orders have been followed.

8. On October 10, 2005, Johnson submitted a sick call request form, stating that he had scabies and that he needed glasses. Johnson had been treated for scabies shortly before

being transferred to Easterling from Kilby on September 19, 2005. On October 12, 2005, I examined Johnson and determined that he needed corrective glasses. That next day, I referred Johnson for an appointment with an outside specialist, Dr. John G. Fortin.

9. On November 9, 2005, Dr. Fortin examined Johnson and diagnosed him with macular degeneration in both eyes. Macular degeneration is an incurable eye disease which typically affects persons over the age of fifty-five (55). The exact cause of macular degeneration is unknown and it is typically thought to be a hereditary condition. Macular degeneration results from the deterioration of the central portion of the retina. Vitamins are often prescribed to prevent the worsening of macular degeneration. Johnson receives a multivitamin daily. Dr. Fortin also noted a scar on the center of Johnson's right eye and cataracts in both eyes. Dr. Fortin concluded that the scar could be indicative of the macular degeneration or some other trauma to the eye. Dr. Fortin concluded that Johnson does not suffer from diabetic retinapathy, a condition causing the blood vessels in the eye to swell and resulting impairment of vision. Dr. Fortin concluded that laser surgery would not be appropriate in Johnson's case, because the surgery would not cure, reverse or prevent Johnson's macular degeneration and it would not correct the scar on his eyes or alter his vision to any significant degree. Dr. Fortin recommended that Johnson be fitted for glasses and ordered that he undergo a follow-up examination in twelve (12) months. Johnson signed a "Receipt of Medical Equipment/Appliance Form" indicating he had received glasses. Johnson has repeatedly expressed to me his desire to undergo laser surgery. However, laser surgery is not appropriate in Johnson's case because he suffers from macular degeneration

10. On October 27, 2005, Johnson submitted another sick call request form complaining of pain in his right leg as well as weakness in his right side, worsening vision and

scabies. As discussed above, I had already referred him to an ophthalmologist regarding the propblems associated with his vision. On that same day, the Easterling medical staff attempted to check Johnson's blood sugar and administer him his insulin injection. Johnson, however, refused to allow the medical staff at Easterling to provide him medical treatment and refused to sign the waiver. On October 30, 2005, Johnson signed a waiver acknowledging that he had refused to report to sick call. That same evening at 10:45 p.m., Johnson signed another waiver acknowledging that he had refused to report to sick call.

11.  On November 7, 2005, Johnson submitted another sick call request form complaining of dizziness, weakness, loss of consciousness, seizures, kidney failure, nerve damage and blindness. Johnson does not suffer from seizures. That same day, Johnson submitted another sick call request form stating that he refused to take his blood pressure medication until he saw a doctor.

12.  On November 11, 2005, Johnson submitted a sick call request form requesting dentures. On December 5, 2005, Johnson submitted another sick call request form requesting dentures. On December 6, 2005, the medical staff at Easterling examined Johnson and determined that he needed upper dentures and partial lower dentures and fillings. On January 17, 2006, Johnson submitted an additional sick call request form requesting dentures. Johnson is currently on the waiting list to receive dentures.

13.  On December 9, 2005, Johnson submitted a sick call request form, requesting "additional chronic care evaluations and prescribed medication that does not leave him in continuous pain." He further stated that "his sugar count was 439 and at a dangerous level and that he needs more extensive testing to determine eligibility for treatment."

14. Other than reporting to the Chronic Care Clinic twice a day to have his blood sugar monitored, I examine and treat Johnson on a regular basis. Johnson complains that the medication I have prescribed him to regulate his blood sugar has made him feel nauseous and dizzy. Nausea, dizziness and weakness are symptomatic of Johnson's medical conditions, including cirrhosis, diabetes and anemia and the side effects of the drugs prescribed to treat those conditions. There is no medical treatment or medication available to completely eliminate the symptoms associated with his medical conditions or the side effects of the medications prescribed for these conditions. Cirrhosis causes sluggishness, confusion and mental wandering. Glucophage and Glucotral, both medications I have prescribed to Johnson to regulate his blood sugar, have side effects which include dizziness and nausea. Another cause of Johnson's dizziness is his anemia. I prescribe Johnson iron pills to take daily, but Johnson has told me that he disagrees with my diagnosis and refuses to take his iron pills as directed. Whenever Johnson complains of dizziness and nausea from Johnson, the medical staff at Easterling checks his blood sugar and insulin levels and his medication may be adjusted if necessary.

15. Regulating Johnson's blood sugar and insulin level is an on-going process. I have adjusted Johnson's insulin on multiple occasions since his incarceration at Easterling. I ordered that Johnson stay in the infirmary from November 15, 2005 to November 23, 2005, due to an exceptionally dangerous increase in his blood sugar. On November 17, 2005, Johnson fell on his left knee. For the remainder of Johnson's stay in the infirmary, I restricted Johnson to a wheelchair because I was concerned that he might fall again as a result of his extremely elevated blood sugar and the dizziness and weakness associated therewith. Johnson requested to take a walk outside, but I advised him that he needed to forego walking outside until his blood sugar was under control. I also ordered an X-ray of his knee and prescribed Johnson Bengay for his

joint pain associated with his arthritis. Other than restricting Johnson to a wheelchair on this occasion, I have at all times encouraged him to exercise, and I do not recommend that Johnson receive a wheelchair for full-time use at this time.

16. On December 7, 2005, I prescribed Johnson Aldactone and Lasix, which are both drugs prescribed to persons diagnosed with cirrhosis to reduce the amount of fluid in the body and eliminate nausea  I also stopped his glucotral. I ordered a blood sugar check and that he return in one week for a follow-up appointment. I also ordered a monofilament test to determine if he had suffered any peripheral nerve loss in his feet as a result of his diabetes. The results of this test indicated no nerve loss. Johnson has not complained to me about his feet hurting or cracking and bleeding. However, I prescribed him insoles and diabetic hose to reduce some of the swelling and pain he had been experiencing in his feet and ankles as a result of his diabetes. Johnson signed a form acknowledging his receipt of insoles and 1 pair of hose on December 7, 2005.

17. Johnson suffers from severe arthritis in his left knee. On November 22, 2005, I ordered Johnson a cane to assist him in moving around Easterling and, on that same day, Johnson signed a release of medical equipment form indicating that he had received the cane. Johnson's arthritis is not so severe that he needs to be restricted to a wheelchair at all times. In fact, exercise is good for Johnson's knee and his overall health. On December 29, 2005, I renewed my prior orders that Johnson be provided a walking cane and Johnson again signed a form indicating that he had received the cane. I have prescribed Johnson Aspirin and Motrin as needed to alleviate the pain in his knee. Due to the deteriorated condition of Johnson's liver as a result of the cirrhosis and the gastrointestinal bleeding, I can only prescribe him Tylenol or Motrin in limited doses as those medications will only aggravate those medical conditions.

18. Johnson has received emergency medical treatment while incarcerated at Easterling on at least two occasions. On December 17, 2005, the medical staff provided Johnson emergency medical care due to gastrointestinal bleeding. Johnson was admitted to the infirmary at approximately 6:00 p.m. The medical staff immediately assessed his vital signs, completed his intake and notified me of the medical emergency. I ordered the medical staff to transfer Johnson to Troy Hospital Emergency Room via ambulance and to start an IV immediately. The Troy Regional Medical Center ("TRMC") admitted Johnson for upper gastro-intestinal bleeding and moderate gastritis. At TRMC, Johnson received a prescription for Protonox and he was subsequently discharged him with orders to remain on the Protonox 40 milligrams daily and 10 mEq of K-Dur daily. Dr. David E. Runyon also ordered Johnson to continue taking all of his other medications. Johnson remained hospitalized at the TRMC until December 20, 2005. Upon his release, I examined Johnson to see how he was feeling and ordered that Johnson remain in the infirmary until he regained some of his strength and to make sure he was taking all of his medications correctly.

19. On December 30, 2005, Johnson again received emergency medical treatment. He complained of dizziness and feeling drunk. The medical staff at Easterling notified me of the emergency and I directed the medical staff to keep Johnson in the infirmary overnight for monitoring. I prescribed Johnson lactulose, a sugar compound that reduces the ammonia level in his blood and thereby reduces the feelings of sluggishness or "feeling drunk" associated with cirrhosis.

20. Johnson has never complained to me about any numbness in his hands. His medical history indicates that Johnson suffered a stroke in 1995. His feelings of numbness are most likely persisting symptoms of his stroke.

21. I have at all times provided Johnson adequate treatment for his diabetes, arthritis, cirrhosis, vision and other medical conditions. I have not refused to provide Johnson with any medical treatment or refused him his prescribed medications. I have not ignored in any way any of Johnson's requests for medical treatment or complaints about his medical conditions.

Further affiant sayeth not.

_____
Dr. Jean Darbouze

**SWORN TO and SUBSCRIBED** before this the 24 day of March, 2006.

_Linda A. Wilkinson_
Notary Public
My Commission Expires: 9/16/2007

(SEAL)

\\HUNTFP01\Home$\dlangham\My Documents\Affidavit of Dr. Jean Darbouze.DOC   9